

```
 1              UNITED STATES DISTRICT COURT
                      DISTRICT COURT
 2

 3     ------------------------X    CIVIL ACTION NO.
       SUSAN C. TILLEY,              3:02CV1312(JCH)
 4           Plaintiff,

 5          vs.                      October 6, 2004

 6     ANIXTER INCORPORATED,
       PACER/ANIXTER INC. and        Volume II
 7     DAVID G. TILLEY,
             Defendants.
 8     ------------------------X

 9

10

11     CONTINUED DEPOSITION of SUSAN C. TILLEY

12

13
            Taken before Elzbieta A. Sirois, RPR,
14     LSR 350, a Court Reporter and Notary
       Public within and for the State of
15     Connecticut, pursuant to Notice and the
       Federal Rules of Civil Procedure, at the
16     offices of Cowdery, Ecker & Murphy, L.L.C,
       750 Main Street, Hartford, Connecticut on
17     October 6, 2004, commencing at 11:47 a.m.

18

19

20

21
                 FALZARANO COURT REPORTERS
22                117 North Saddle Ridge
                 West Simsbury, CT 06092
23                    860-651-0258

24

25
```

1
2              (Defendants' Exhibit No. 11:
3              Marked for Identification.)
4
5  BY MR. SMART:
6     Q    Showing you what has been marked as
7  Plaintiff's Exhibit 11.  Is that a letter from you?
8     A    Yes.  Yes, it is.
9              MR. MUCHINSKY:  You gave me two.  Are
10             there two here?
11             MR. SMART:  No.
12    Q    Is that a letter that you sent to the
13 Review and Adjustment Unit of Support Enforcement
14 Division on July 9, 1998?
15    A    I have to read it.
16             MR. SMART:  Can we read back the
17             pending question, please.
18
19             (Record read by the
20             Court Reporter.)
21
22    A    I'm not sure.  I wrote a lot of letters.
23 Some of them got sent and some weren't.  So I don't
24 know if this was in my file or something that they
25 received from Support Enforcement.  I, I did write

6

```
 1   letters.  Some of them were never sent and some
 2   were.  So, I'm not sure.
 3       Q    This is a letter that you produced to me.
 4   Is it not?
 5       A    If it was in my file, yes.  It doesn't
 6   mean I sent it to this person because I wrote a lot
 7   of letters, but they weren't always sent out.
 8       Q    So what you're saying is you're not sure
 9   whether you sent it?
10       A    Yes.
11       Q    But you did write it?
12       A    Yes.
13       Q    It was something that you wrote in July of
14   1998?
15       A    That's what the date says.
16       Q    In the document you state that, with
17   reference to David Tilley, that his employer is
18   hiding his income; is that right?
19       A    Yes.  It says that -- I don't know if --
20   it says, it says my child support has been based on
21   his fraudulent misrepresentation of his wages.
22       Q    Okay.  And that's a reference to the
23   allegations that you're making about the alleged
24   misrepresentations at the time of the trial, at the
25   time of the divorce rather regarding Mr. Tilley's
```

1  income?

2  A  Yes, I believe so.

3  Q  Just drawing your attention to the page
4  marked 1689, in the second full paragraph there.
5  Perhaps that will refresh your recollection on the
6  question of whether you were writing at this time
7  about the diversion of -- the alleged diversion of
8  income from David to Terri Tilley?

9  A  And what are you referring to?

10  Q  If you see the second full paragraph on
11  page 1689?

12  A  Which paragraph?

13  Q  The one that starts, Based on the facts
14  and the folders.

15  A  You want to know what I'm referring to in
16  that paragraph?

17  Q  Yeah.  In that paragraph you're referring
18  to the allegations that you're making in this case
19  about the alleged diversion of income by the
20  corporate defendants from David to Terri, right?

21  A  Yes, and also from his previous employer
22  IMS.

23  Q  Having now looked briefly at the letter,
24  does that refresh your recollection as to whether
25  or not you sent this to Support Enforcement?

```
 1   income.
 2       Q    Okay.  But you don't know?
 3       A    I don't know, no.
 4       Q    So drawing your attention now to what has
 5   been marked as Exhibit 13.  Is this a letter that
 6   you did send to Support Enforcement?
 7       A    I don't know.
 8       Q    If you would take a look at the second
 9   page of the document as well.  Perhaps that will
10   refresh your recollection.
11       A    What was the question.
12       Q    Whether this is, this Exhibit 13, first
13   page of it was a letter from you dated May 12,
14   1998, which you sent to Support Enforcement in
15   Hartford?
16       A    Yes, it looks like one.
17       Q    Was this your request that Support
18   Enforcement act to collect your arrearage on the
19   garnishment order?
20       A    Repeat that again.
21       Q    Was this your request to Support
22   Enforcement to try to collect the arrearage that
23   you claim was owed on the support order?
24       A    The letter says, "I am requesting a review
25   of my case for a child support modification."  It
```

1    does not say arrearage, I don't believe.
2        Q    Why don't you take a look at the second
3    paragraph.
4        A    It says, "An arrearage amount is owed and
5    nothing has been done to try to collect."
6        Q    Okay.  So does this refresh your
7    recollection.  Were you asking Support Enforcement
8    to do two things at this time.  One, to conduct a
9    review to determine whether a modification of the
10   support order was warranted.  And Two, to act, to
11   collect your arrearage that you claimed was
12   outstanding?
13       A    That's what it looks like it to be, yes.
14       Q    Now, looking at the next page, 196, of
15   this same document.  This was the response that you
16   got from the state of Connecticut Support
17   Enforcement people telling you that they were in
18   touch with the North Carolina Support Enforcement
19   people asking them to act on the arrearages owed;
20   is that right?
21       A    This says, "The petitioner is requesting
22   that action be taken to pursue payment on
23   arrearages owed.  Please take the appropriate steps
24   to do so and inform us of any actions taken."
25       Q    That's a copy that you received of a

```
 1  that what you're asking me?
 2      Q    Yes.  Why don't you tell me that.  Did you
 3  attach anything to the letter?
 4      A    I don't remember.
 5      Q    Just to come back to the question I had
 6  asked you earlier now that we have talked about
 7  Exhibits 13 and 12 as well.  That has refreshed
 8  your recollection as to whether you did send this
 9  letter in Exhibit 11 to Support Enforcement?
10      A    I don't know if I actually sent it.  I
11  wrote a lot of letters to a lot of people trying to
12  get help.  I don't know which ones I sent and which
13  ones I didn't, to be honest with you.
14
15             (Defendants' Exhibit No. 14:
16              Marked for Identification.)
17
18  BY MR. SMART:
19      Q    Showing you now what's been marked as
20  Exhibit 14.  Is this a report by U.S. Search to you
21  responding to your request for information about
22  Susan Tilley?
23      A    About Theresa Tilley.
24      Q    I'm sorry.  About Theresa Tilley?
25      A    Yes, it is.  It's is.  1-800 U.S. Search.
```

1  Q   You got this report on or around
2  October 20th, 1998?
3  A   That's the date on the document.
4  Q   That is close to the time that you
5  received it?
6  A   Actually a girlfriend of mine did this for
7  me, so I don't know if she received it first or
8  gave it to me or if I got it a week later or I
9  don't know.  A friend of mine did this for me.
10 Q   It's addressed to you; isn't it?
11 A   Yes, it is.
12 Q   So what you're saying is that you didn't
13 request it?
14 A   I asked my girlfriend.  My girlfriend told
15 me about it and she said she would do it for me.
16 Q   Who was the girlfriend?
17 A   Valerie Slayton [ph].
18 Q   You asked her to go ahead and request the
19 report from 1-800 U.S. Search?
20 A   I believe so.
21 Q   That was sometime before the date on the
22 report of October 20th, 1998?
23 A   This was -- can you repeat your question?
24 Q   Just to confirm the date, you asked your
25 friend Valerie to request this report on your

```
 1   behalf sometime before the October 20th, 1998,
 2   date?
 3        A    I don't remember.
 4        Q    Okay, but it is dated October 20th, 1998,
 5   right?
 6        A    Yes.
 7        Q    So is there any reason to doubt that you
 8   requested it before October 20th, 1998?
 9        A    I don't know how long it takes to get
10   these things or when she actually handed it to me.
11        Q    But you didn't request or she didn't
12   request this on your behalf and you didn't make the
13   request to Valerie after October 20th, 1998, right?
14        A    Right.
15        Q    There's a handwritten note again on page 7
16   of the document?
17        A    Yes.
18        Q    This is Exhibit 14.  Is that in your
19   handwriting?
20        A    Yes, it is.
21        Q    Would you read that to me.  I have a hard
22   time reading it.  It's very faint on my copy.
23        A    "She purchased this home two days after
24   our divorce in her name, $215,000 home.
25        Q    The part about the $215,000 home, that
```

1    wasn't in your handwriting, right, that's --
2         A    No.
3         Q    So just keep reading, please, the whole
4    note in your handwriting.
5         A    "Because of the stalking laws of N.C.,
6    North Carolina, I could not get information on the
7    two vehicles she owns and a yacht that they own.
8    All assets of are in her name."
9         Q    Was that a note to yourself or was it a
10   note to somebody else?
11        A    To me.
12        Q    Did you write that note, you know, around
13   the time of the report?  In other words, around
14   October 20th, '98?
15        A    No.  I think I wrote those notes when I
16   was going through my file for modification at one
17   point or another.
18        Q    That was -- was that at the time that Beth
19   Rittenband had filed her motion or modification on
20   your behalf?
21        A    I don't believe Beth filed for a
22   modification until April of 1999.
23        Q    Right.  So was that the time that you
24   wrote the note?
25        A    I don't know.  I don't know when I wrote

```
 1            to other requests.
 2                 MR. BLOSS:  As we're talking, because
 3            of a claim of privilege, are there any
 4            other documents that weren't disclosed?
 5                 MR. MUCHINSKY:   No.
 6   BY MR. SMART:
 7       Q    So Beth Rittenband on the arrearage issue,
 8   by filing the 1998 lawsuit against Pacer and
 9   Anixter and other Defendants, is that one of the
10   things she did for you?
11       A    She filed -- I hired her to go collect the
12   wage garnishment money that I was shorted over the
13   years.
14       Q    How did she do that?
15       A    She said she placed an injunction on Pacer
16   and Anixter, whatever.
17       Q    That was in the 1998 lawsuit?
18       A    Yes.
19       Q    Then in 1999 she filed a motion for
20   contempt on your behalf and also a motion for
21   modification on your behalf in the divorce
22   proceeding, right?
23       A    Yes.  In 1999, April of 1999.
24       Q    That was April of '99?
25       A    I believe.
```

1    Q    Showing you now what has been marked as
2    Defendants' Exhibit 15. That's the motion for
3    contempt that she filed on your behalf in April of
4    '99, right?
5    A    Yes, it is.
6    Q    If you look at the last page just briefly,
7    there's an order from the court regarding a hearing
8    that was to take place on December 1, 1999, on this
9    motion. Is that what the last page is?
10    A    I don't see where it says that. Let me
11    read.
12             (Pause.)
13    A    Can you repeat the question. I don't see
14    where you're talking about.
15    Q    Have you ever seen this last page of the
16    report before -- of the motion before?
17    A    I don't remember it.
18    Q    Okay. You've seen the first two pages
19    before then?
20    A    I see it, but it doesn't look like the
21    same document to me. I don't know why. I see
22    April, but I don't remember it looking like this
23    for some reason.
24    Q    Let me show you what's marked as
25    Exhibit 16. That's a motion for modification that

```
 1   Beth Rittenband filed on your behalf in April 19,
 2   1999, right?
 3       A   Yes.  Yes, it is?
 4       Q   Have you seen that motion before?
 5       A   Yes.  I remember seeing it.  I think it
 6   was this one.  To me it looks different than -- but
 7   I remember seeing something like it.
 8       Q   Do you remember that a hearing was
 9   scheduled for September 1st, 1999, on this motion?
10       A   I don't remember.  All I remember is I
11   hired Beth Rittenband to file in April of 1999
12   because my alimony was running out in October of
13   that year, 1999, and I asked her to modify.
14       Q   Did you sign a second retainer letter with
15   her at the time you hired her to file the motion to
16   modify?
17       A   I don't remember.  I think I did, but I'm
18   not sure.  Yes, I think I did.
19       Q   Did you produce that to Mr. Muchinsky?
20       A   I'm not sure.  I produced everything.
21   There was a thousand documents.
22           MR. MUCHINSKY:  I don't recall that
23           document but we can double check.
24   BY MR. SMART:
25       Q   Okay.  Would -- I'd ask both of you,
```

```
 1   please, to look for that and once it's located, to
 2   produce it to us.
 3           Do you recall what this second retainer
 4   letter said?
 5       A   I would assume it would say something
 6   about a modification, that's if I hired her to
 7   modify and she filed motions to modify.  I would
 8   think it would say motion to modify.
 9       Q   Showing you what's been marked as
10   Defendants' Exhibit 17.  Is that a letter from Beth
11   Rittenband to Steve Ecker?
12       A   It says, Dear Steve, and it's signed by
13   Beth Rittenband.  So, yes.
14       Q   Is the date on that August 4, 1999 --
15   August 2, 1999 rather?
16       A   Yes, it is.
17       Q   Is attached to this a subpoena requesting
18   from the corporate defendants in this action pay
19   records regarding David and Terri Tilley?
20       A   I never seen this before so I need to read
21   it first before I can answer your question.
22       Q   Take your time and take a look at that and
23   take a look at the next few pages as well.
24       A   Never saw this in my entire life.  That's
25   all news to me.  Just like the other document is
```

```
 1  all news to me that we asked them for.  Never saw
 2  it.  Never.
 3       Q    What other document are you referring to?
 4       A    The other document for -- I don't remember
 5  what it was.  The lawsuit document.
 6       Q    What lawsuit document?
 7       A    Lawsuit.  Saying it was a lawsuit
 8  document, but I never seen that in my life.  All I
 9  saw -- all I know is I hired her to modify my child
10  support and motion for contempt, and but this --
11  I've never seen.
12       Q    "This," you're referring to Exhibit 17?
13       A    This (indicating.)  Yes, I am.  I never
14  knew I was going to have a deposition or anything.
15       Q    Did you know before today that Beth
16  Rittenband had subpoenaed records from Pacer at the
17  time that she filed your motion for modification?
18       A    Yes.  She said -- she called me and said
19  she received records.  She -- for our modification.
20       Q    Okay.
21       A    Yes.
22       Q    And you knew that she had requested and
23  gotten pay records from Pacer regarding the
24  compensation paid to Terri and David?
25       A    Whatever was in the file that I saw, yes.
```

```
 1   I don't remember exactly what was in the file, but
 2   she said she had subpoenaed their wage information
 3   and received it, yes.
 4       Q   She was subpoenaing the records of Terri
 5   and David because she was looking into your
 6   allegations regarding the switching of income from
 7   David to Terri, right?
 8       A   I don't remember what she was doing at
 9   that time.
10       Q   In your motions, first looking at your
11   motion for contempt, number 15. There's a
12   reference there in paragraph number two stating
13   that the Defendant's actual income was greater than
14   that which he reported at the time of said orders.
15   That's a reference to your claim that there was a
16   misrepresentation made at the divorce proceeding in
17   '94 regarding David's income, right?  I'm talking
18   now about Exhibit 15, which is the motion for
19   contempt.
20       A   Yeah, I'm looking at it.  It says - ask
21   the question again, please.  I had to read this
22   because it's so old.
23
24              (Record read by the
25               Court Reporter.)
```

A   No, I don't believe it is. She received payroll records, I believe, when she filed motion for contempt and modification and in those payroll records there was a payroll document, and I would imagine that's what she was referring to, but I can't be sure of that, I don't know. She wrote this up. I read it, but I don't know what she was actually referring to in the file itself, so, I believe it would be the wage switch. That's what I would -- but I don't know.

Q   But her subpoena actually came a little bit later, didn't it?

A   Subpoena?

Q   The subpoena pursuant to which she got those wage records is attached as part of Exhibit 17, isn't it?

A   I never seen this before. I don't know what she did. She did a lot of things that I didn't even know she was doing. This is dated August 2, 1999. I believe we had -- I don't know. I don't remember when she got notices or information. I don't remember, and all I know is she filed a motion in court in April 19, 1999. I don't actually know when she received the payroll

1  records.

2  Q    What things did Beth Rittenband do that
3  you didn't know about?

4  A    This. There was a -- when I received the
5  document from you people, I had never seen that
6  document before.

7  Q    When you said "This," were you talking
8  about Exhibit 17?

9  A    No. I'm talking about something that's in
10 the file. It was the lawsuit, some lawsuit in 1998
11 having to do with the injunction and that I had
12 never seen it before until my attorney received it
13 from you.

14 Q    Your attorney meaning?

15 A    Bob. Mr. Muchinsky. And then this right
16 here. I've never seen this.

17 Q    This right here is?

18 A    Exhibit Number 17.

19 Q    Okay.

20 A    I've never seen this before.

21 Q    I see. So you didn't know about this
22 subpoena that she issued, is that what you're
23 saying?

24 A    No. She just -- I just hired her and she
25 did what she had to do as a lawyer, but I never

1   received a copy of this.
2       Q    Okay.  And the other thing you didn't know
3   about is the lawsuit filed against Pacer in 1998,
4   is that what you're saying?
5       A    Yes.
6       Q    You didn't know that that lawsuit had been
7   filed on your behalf?
8       A    I thought she -- I thought she put an
9   injunction on the company.  I had no idea that it
10  was a lawsuit.  To me it was a simple piece of
11  paper, an injunction.
12      Q    Okay.  And what else did she do that you
13  didn't know about?
14      A    I don't remember.  I don't remember if
15  there's anything else or not.  Unless there's
16  papers that I still haven't seen yet.  This I've
17  never seen.  There's no cc to me on this.  I never
18  received that.
19      Q    Is it your recollection now that part of
20  the basis for your seeking a modification in April
21  of 1999 as well as seeking a contempt citation in
22  April of 1999 was the alleged misrepresentations
23  about Mr. Tilley's income at the time of the
24  divorce?
25      A    Can you ask me the question again?