A It makes sense.

Q That was the time, approximately, when you returned the files to Ms. Tilley?

A Correct. I returned the file and a check that she asked for at the same time.

Q You gave her your notes as well at that point?

A I gave her everything.

Q So at the time when you received my subpoena, document exhibit number 45, you didn't have any documents responsive to my request?

A Nope.

Q That was because you had given everything back to Susan, right?

A Correct.

Q In coming here today, you did bring some documents with you, however, right?

A Yes.

Q Those are some documents that I mailed to you?

A Correct.

Q They're documents that were documents connected to your representation of Ms. Tilley?

A Correct.

Q And in addition, there was some pages of a

transcript, right?

A Right.

Q Of the deposition transcript?

A Yes.

Q So going back now briefly to the action that you filed in 1998 on Ms. Tilley's behalf, that's the verified complaint, Defendants' Exhibit 29. That action was filed at a time when a corporate transaction was going on involving some of the Defendants, right?

A Correct.

Q There was a proposed transaction involving Pacer and Summit Partners and Anixter, right?

A Yes.

Q Essentially Anixter was taking over Pacer at that point, do you recall?

A I recall it as being a merger. I don't recall exactly the -- that they were going to completely take over. I thought it was a merger, but I guess same idea.

Q You filed this action just shortly before that was due to take place?

A Yes.

Q It was kind of a vulnerable time for the Defendants?

A Absolutely. That's the whole point.

Q Your injunction sought to stop that corporate transaction that was coming, right?

A Correct.

Q The Defendants in that action were prepared to pay a price to settle the action quickly, right?

A I wouldn't know what they were prepared to do. I can tell you what they did.

Q They did settle the action quickly?

A Yes, they did.

Q Do you recall whether any counsel for any of the Defendants suggested to you that you had caught them at a vulnerable time and, therefore, they were willing to pay for --

A Yes, I do.

Q -- to clarify the matter?

A Yes, I do.

Q There were such conversations?

A Yes. Can I say something else or do I have to wait until you ask me a question because I don't think you're going to ask me this.

Q Sure. Please, go ahead.

A I would like to say how I knew about the merger.

Q Yes. I would be interested in how you knew about the merger.

A Sue Tilley told me. It was her idea to file the suit at that time to stop the merger because they would be -- she thought -- she was right, more willing to settle.

Q Do you recall any of the other details in terms of Ms. Tilley's mentioning that to you?

A I don't recall how she found out, but she had been researching and following the business and financial goings on and doings of her ex-husband and her ex-husband's new wife at the time and knew everything about what was going on with those companies.

And she's the one that gave me all of the information. I wouldn't have any idea how to find that out on my own. I'm not a business person.

Q She had that information from the first time you met with her?

A I don't think from the first time I met with her, but shortly after at least.

Q Do you recall when the first time was that you did meet with her?

A I don't. I do think it was at least a month before we did the fee agreement.

Q Then with the fee agreement as a landmark, by the way, that fee agreement is dated again May 29, 1998?

A Correct.

Q Correct. That was about a week before the action was filed, Exhibit 29?

A Correct.

Q With respect to either the verified complaint or in comparison to the date that you signed the fee agreement, do you recall when Ms. Tilley brought to you the information about this transaction going on?

A It would have been before the fee agreement. As I recall, we didn't do the fee agreement until we knew what we were doing so that I could state it correctly in the fee agreement about the situation.

She had come to me about the situation. She was referred to me by a friend of hers who I represented in family court. And when we decided what course of action we were going to take, then we did the fee agreement, and I believe I had already started writing the complaint as well, just wasn't finalized until June 8th.

Q There was some period when you were

showing her the complaint and she was giving you feedback and you were making changes?

A Correct.

Q Do you recall any of the changes that she suggested making?

A Not specifically, but they were factual dates and some of the things that would have been in the names of the parties, things like that. Amounts of money, she calculated and showed me how she calculated them. Dates, things like that.

Q Did she give you any documentation that provided you with background information to assist you in your work?

A As I recall, she had some documents from the company which I guess was Pacer, because that's who her husband was working for, and I'm thinking wage stubs and whatever she would have gotten as a receipt or cancelled check or whatever from her money that she got for the child support and that she was supposed to be getting from Pacer. I don't know. I don't remember what those things would have been called, but.

Q You said earlier, I think, that at that time she shared with you also information concerning Mr. Tilley's, her former husband's wages

from Pacer, right?

A Correct.

Q She also shared with you information about Ms. Tilley's, that is David Tilley's --

A Theresa I think is her name; is that right.

Q -- new wife, Theresa Tilley? Yes. At that time she also shared with you information about Theresa Tilley's wages?

A Correct.

Q What kind of information did she have about the wages of David and Terri Tilley?

A I don't remember exactly. She was of the belief that, and this was the basis for the complaint, that Michael Rosa specifically was giving -- putting David's commissions into Theresa's paychecks so that Sue wouldn't get the proper amount of child support taken out of the check. That was one of the issues.

Q That was one of the issues that the verified complaint in June 6th, on or around June 6th of 1998 was about?

A Correct.

Q The verified complaint that Ms. Tilley actually signed?

A Correct.

Q That's Exhibit 29, right?

A Right.

Q The information that she shared with you regarding this alleged transfer of income by Pacer from David to Terri, that's the nature of the information that she shared with you, right?

A Right. I recall that she had somehow documentation of how much he got, David got for bonuses, how much Theresa got for bonuses, how much they got for commissions at different times and she was showing me how all of a sudden Theresa's had increased and David's had gone down, and it didn't mesh and it seemed suspicious.

Q That was in the few weeks before June 8, 1998, when that verified complaint was filed?

A I don't remember how long we had been talking about it before I did -- before I filed the complaint, but I think probably a couple of months.

Q But it was before the complaint was filed in June of 1998?

A Correct.

Q Eventually, this action that you filed was settled, right?

A Yes.

Q You mentioned that before that it was settled?

A I did. Can I say one other thing?

Q Please.

A She also says in her deposition that I had her sign something, I guess the verified complaint, in a hurry because I was going to Florida. I did go to Florida, but the hurry was not the trip. The hurry was stopping the merger, and she knew that.

Q The hurry, in other words, to get the matter, get the documents signed and to get it filed?

A Correct.

Q Because you wanted to get it in before the merger took place?

A Correct.

Q Because you knew that that was the vulnerable time?

A Absolutely.

Q Vulnerable for the Defendants, that is? The Defendants in fact were responsive in the sense that they were interested in settling the matter once it was filed, right?

A Right.

Q In fact, it did get settled. Do you

recall how long it was before it got settled?

A I think only a couple of weeks.

Q It was settled with a payment by the Defendants to Ms. Tilley, correct?

A Correct.

Q Do you recall what that payment was?

A The total was 10,000. I got five and Sue got five.

Q There was also a release that Ms. Tilley signed, right?

A Correct.

Q Showing you what was earlier marked as Defendants' Exhibit 30. Is that the release that Ms. Tilley signed in the settlement of the June 1998 action?

A It is. And now actually I think I have to change something that I said earlier. That she must have, based on the witness, come to my office to do this. I don't recall her coming to my office, but the witness was my office mate. So I don't know where else that would have happened.

Q That witness is Mr. Fiedler?

A Correct.

Q So, what you're talking about in terms of her coming to your office is specifically with the

signature of the release, you're inferring now she came to your office?

A I'm guessing she must have. I don't recall it happening that way, but I can't think of where else he, Attorney Fiedler, would have been that I would have had her go to, but I just remember going to her house all the time.

Q You remember going to her house on many occasions?

A Right. She lived in Rockville, and I did a lot of work in Rockville Juvenile Court, and I usually went there before or after court.

Q Now, with respect to the release, the release does have a carve out on it in the sense that there is an exception to the release that's specifically mentioned in there, right? And that is specifically an exception as to any claims that Susan may have against David Tilley?

A Correct.

Q So the --

A Because she wasn't suing David Tilley in the complaint.

Q David Tilley wasn't one of the Defendants in that action?

A Right.

Q And David Tilley was an employee of Pacer at that time, though? Is that your recollection, though? Right?

A Yes.

Q So it was important to make it clear that Susan hadn't waived her claims against David, right?

A Correct.

Q But, there isn't any other carve out or exception to the waiver specified there, right?

A Right.

Q At the time that this release, exhibit number 30, was signed by Susan Tilley, she had, previous to that point, shared with you information about her alligation that Pacer had shifted income rightfully payable to David and paid it instead to Terri Tilley?

A Correct.

Q She had also shared with you information at that point about her alligation that David Tilley and Michael Rosa had misrepresented David's income during the divorce proceeding?

A Correct.

Q So, both she and you knew about those alligations at the time that this release was

signed, right?

A Yes.

Q In fact, the action, which is specifically referenced in this release, is the action that was started with the complaint marked here as Defendants' Exhibit 29, right?

A I'm sorry. Say that again. I didn't follow that.

Q Yes. I will gladly rephrase that. The release makes reference, to more particularly, all claims or demands arising or asserted or in connection with a specific action, correct?

A Correct, right.

Q That action is the verified -- it's the action that was begun with the verified complaint dated June 8, 1998, which is Exhibit 29?

A Yes.

Q You testified earlier that that action was actually based in part on the allegations that income was transferred improperly by Pacer from David to Terri in order to minimize David's child support obligations?

A Right. I don't recall, though, that -- I don't recall whether or not it talks about at the time of the divorce. Maybe it does. I don't know,

but I'd have to read it again, but I do recall that it was postjudgment withholdings that we were talking about.

Q So you're saying, in other words, that in this verified complaint you're not sure if there's a reference in there or if that was specifically making or intended to make claims about the misrepresentations that Mr. Rosa and David Tilley allegedly made at the time of the divorce?

A Right. This is just avoiding, at least I think, the withholdings that had already been ordered, but I don't recall that it has in here anything about what you had mentioned about misrepresenting income at the time of the divorce, in this particular complaint.

It talks about transferring money and, therefore, not paying the $360 a week that was supposed to be paid.

Q Okay. Just so I can clarify, at the time that this verified complaint was filed in June of 1998, one of the things that that complaint was based on was Susan Tilley's allegations that Pacer had improperly deflected some of David's income to Terri in order to minimize David's child support obligations, right?

A Depends on what you mean by "child support obligations." If you're talking about the obligations that the judge put on him at the time of the divorce, no, but the judge had ordered, based on whatever the information he had, I wasn't there at the time of the divorce, that he have $360 a week taken out of his paycheck by Pacer and paid directly to Susan Tilley, and as I recall, the shifting of the money was so that they could claim -- that he could claim that that would have been more than a certain amount of the percentage of his pay and, therefore, he couldn't pay the whole 360. So she didn't get the whole 360 when she was supposed to. If that makes sense.

Q Okay. And this alleged scheme to help him avoid paying the 360, that was a scheme that in Susan's belief was being carried out through a diversion of income from David to Terri by Pacer?

A Correct.

Q At the time of the release, which is exhibit number 30, was signed, those claims about this alleged diversion of income were part of what was being released?

A Right. Up to the time of -- any diversion up to the time of the complaint.

Q In fact, the release accomplished a -- let me withdraw that. This release was given by Ms. Tilley in return for a payment by the Defendants, including by Pacer and by Anixter?

A Right.

Q That payment was the $10,000 you that had mentioned earlier?

A Right.

Q Those claims about the alleged shifting of income and shielding of income by shifting income from David to Terri by Pacer, those claims were settled by the $10,000 payment by the Defendants, right?

A Claims that are in the complaint, yes, right.

Q And those claims include the underlying claim that this alleged transfer of income from David to Susan -- to Terri rather -- had taken place?

A Correct.

Q The release, in fact, contains some broad language in it about a release of all claims up until that point in time by Susan against the Defendants, right?

A I don't know if I would say that. It

says, "Particularly, in this action," but I mean I don't know if you're asking me what I recall or if you're asking me for a legal opinion.

Q Well --

A Can we actually take a break for a minute.

Q Absolutely.

(Recess taken.)

BY MR. SMART:

Q I think you had mentioned earlier the name Michael Rosa, right?

A Right.

Q He was a one of the Defendants in this June '98 action?

(Off-the-record discussion.)

A Yes.

Q We just went off the record briefly because there was a phone ringing in the room, and so back on the record. Michael Rosa was one of the Defendants in the June 1998 action, Exhibit 29, right?

A Yes.

Q Was he an officer at Pacer at the time that action was filed?

A I don't recall what his position was.

Q Do you recall whether he was affiliated with Pacer?

A Yes.

Q But you don't remember exactly what position he had?

A Right.

Q You recall it was some sort of executive or leadership kind of position with the company?

A I don't know.

Q Do you recall whether he was David Tilley's boss?

A Sounds right, but I am not really sure. It would make sense. I recall that he was the person that was doing the diversion. I don't recall what his job was that allowed him to be the one to do that.

Q Going back now briefly to Exhibit 30 that's the release, as I think you identified earlier, there is an exception on the release states it's not intended to release claims Susan Tilley may have directly against David Tilley, right?

A Correct.

Q In fact, Susan Tilley had gotten a divorce from David prior to this point, right?

A Right.

Q And after this release was signed you did some work on behalf of Susan Tilley in the divorce action in a postjudgment phase of the divorce action, right?

A I apparently filed a motion, but I never went to court for that.

Q In other words, you never had any hearings or arguments or anything before a judge in the divorce action?

A Right.

Q But you did file a few motions on Susan's behalf?

A Right.

Q In addition, you also did some discovery on her half, right?

A Right. I don't recall if that was for the family matter or for this though. I don't remember which case that came under.

Q Okay. Let me try to clear things up a bit by showing you what has been earlier marked as Defendants' Exhibit 15 and that is the motion you