1   filed on Susan's behalf in the divorce proceeding
2   for contempt around April 19th of 1999?
3       A   Right.
4       Q   At about that same time you also filed a
5   motion for modification in the divorce action
6   against David Tilley, do you recall that?
7       A   Not off the top of my head.
8       Q   So showing you what's been marked as
9   Defendants' Exhibit 16. Does that refresh your
10  recollection as to whether you filed the motion for
11  modification on Susan's behalf in the divorce
12  action against David?
13      A   Yes.
14      Q   This Defendants' Exhibit 16 is that motion
15  for modification, right?
16      A   Right.
17      Q   Let's mark this as an exhibit, please.
18
19              (Defendant's Exhibit No. 48:
20              Marked for Identification.)
21
22  BY MR. SMART:
23      Q   And showing you now what has been marked
24  as Defendants' Exhibit 48. Is that a notice of
25  deposition that you issued on Susan's behalf in the

```
 1   divorce action against David?
 2        A    Yes.
 3        Q    It's dated May 11, 1999?
 4        A    Right.
 5        Q    Did you issue this notice of deposition?
 6        A    Yes.
 7        Q    It was to Michael Rosa?
 8        A    Correct.
 9        Q    You were seeking to depose Michael Rosa in
10   other words, right?
11        A    Right.
12        Q    You sought some documents in conjunction
13   with this deposition, right?
14        A    Right.
15        Q    You were seeking payroll wage and benefit
16   records for all years of employment for David
17   Tilley?
18        A    Right.
19        Q    Specifically pertaining to his employment
20   with Pacer?
21        A    Correct.
22        Q    Also, you were seeking the same kinds of
23   documents, all of those kinds of documents,
24   regarding Theresa Tilley?
25        A    Yes.
```

1  Q    Also, any contract for employment that
2  David had with Pacer?
3  A    Right.
4  Q    You then engaged in a bit of
5  correspondence communications with counsel for
6  Pacer regarding your discovery in the divorce
7  action, right?
8  A    Right.
9       MR. SMART:  And could we mark this,
10      please.
11
12      (Defendant's Exhibit No. 49:
13      Marked for Identification.)
14
15 BY MR. SMART:
16 Q    Showing you now what has been marked as
17 Defendants' Exhibit 49, is that a letter that you
18 received from Steve Ecker of this office who was
19 representing Pacer at the time in connection with
20 your deposition notice to Michael Rosa?
21 A    Yes.
22 Q    That was dated about June 4, 1999?
23 A    Right.
24 Q    Subsequent to that you then wrote back to
25 Mr. Ecker, right, do you recall?

```
 1      A    Yes.

 2

 3           (Defendant's Exhibit No. 50:

 4           Marked for Identification.)

 5

 6      Q    And I'm showing you now what has been
 7 marked as Defendant's Exhibit 50 is that letter
 8 that you wrote on June 11th to Steve Ecker?
 9      A    Yes.
10      Q    It's about the discovery that you were
11 doing in the divorce case?
12      A    Right.
13      Q    You were specifically replying to the
14 letter that he had sent you earlier on June 4th,
15 1999, which is dated, which is marked as
16 Exhibit 49, right?
17      A    Right.
18      Q    In this letter, Exhibit 50, dated
19 June 11th, you state that, "In response to your
20 letter dated June 4, 1999, I did leave a verbal
21 message for you last week stating that I am seeking
22 all wage records of both David and Theresa Tilley.
23 Including regular pay, commissions, bonuses, car
24 allowances, benefit plans and anything else that
25 can be considered income for the last five years,"
```

1  right?

2     A    Right.

3     Q    I think you go on to say that you hope

4  it's provided with some expediency as this

5  information is central to your case that is

6  currently pending, right?

7     A    Right.

8     Q    Subsequent to that you received a letter

9  from Mr. Ecker indicating that he would accept a

10 subpoena on behalf of Pacer from you for the

11 records that you were seeking regarding David and

12 Terri's pay?

13    A    Right.

14         MR. SMART:  Let just mark that,

15    please.

16

17         (Defendants' Exhibit No. 51:

18         Marked for Identification.)

19

20 BY MR. SMART:

21    Q    Showing you what has been marked as

22 Defendants' Exhibit 51.  This is a letter from

23 Mr. Ecker to you indicating that he's going to

24 accept the service, right?

25    A    Right.

```
1     Q    It's dated July 1st, 1999?
2     A    Correct.
3     Q    He's going to accept the service of the
4   subpoena that you were about to issue seeking
5   Pacer's payroll records and related documents
6   regarding David and Terri's pays, right?
7     A    Right.
8     Q    Then you subsequently sent Mr. Ecker the
9   subpoena, right?
10    A    Yes.
11    Q    Showing you what's been previously marked
12  as Defendants' Exhibit 17.  That's a letter with a
13  subpoena attached and also a notice of deposition
14  attached all pertaining to your discovery in the
15  Tilley v. Tilley divorce action, right?
16    A    Right.
17    Q    What you specifically indicate there is
18  that you're seeking any and all records, documents,
19  papers and memoranda regarding David Tilley and
20  Theresa Tilley, including but not limited to,
21  salaries, wages, draws, bonuses, and so forth,
22  right?
23    A    Yes.
24    Q    Okay.  Then well let me just withdraw that
25  and say so in other words, at a certain point you
```

```
 1   were seeking information about David and Terri's
 2   income compensation from Pacer through a deposition
 3   of Mr. Rosa, right?
 4        A    Right.
 5        Q    And then the -- the tactic changed a bit
 6   later and you sought that information through a
 7   subpoena that you served on Mr. Ecker, right?
 8        A    Right.
 9        Q    You were seeking that information because
10   it was all central to the action that you had
11   pending on Susan's behalf against David, namely the
12   motion for modification and the motion for contempt
13   filed in April?
14        A    Right.
15        Q    That's because the motion for modification
16   and the motion for contempt were seeking,
17   specifically against David, relief based on the
18   alleged diversion of income by Pacer from David to
19   Terri?
20        A    Right.
21        Q    In fact, in that April -- in that series
22   of April motions, you were also raising an
23   allegation as well regarding specifically the
24   alleged fraudulent representations at the time of
25   the divorce regarding Mr. Tilley's income paid by
```

```
 1   Pacer, right?
 2        A    Right.
 3        Q    That was correct?
 4        A    Yes.
 5             MR. MUCHINSKY:  Excuse me.  What was
 6        that?  What exhibit?
 7             THE WITNESS:  15, right?
 8             MR. SMART:  In Exhibit 15.  15 and
 9        16.  Motion for modification and motion
10        for contempt.
11             THE WITNESS:  I think it's in 15.
12   BY MR. SMART:
13        Q    In April?
14        A    Yeah, it's in 15, paragraph 2.  The
15   Defendants' actual income was and is considerably
16   greater than that which he reported at the time of
17   said orders.  The defendant has committed fraud,
18   right, paragraph 2 and 3 of Exhibit 15.
19        Q    And it's also mentioned, isn't it, in the
20   Exhibit 16, which is the motion for modification?
21        A    I don't think so.  Well, actually sort of.
22   It says the income claimed by the Defendants at the
23   time of said orders was and is considerably less
24   than his actual current income.
25        Q    That is --
```

1      A     It says actual current income, so...kind
2  of.
3      Q     That was in part a reference to the
4  alleged fraud regarding the current income that he
5  had at the time of the divorce, right?
6      A     Right.  I think.  Maybe.
7      Q     It says, doesn't it, that the income
8  claimed by Defendant at the time of said orders.
9  Well, that said orders, that's a reference to the
10 orders --
11     A     The divorce orders.
12     Q     -- at the time of the divorce in '94,
13 right?
14     A     Right, but it says it's considerably less
15 was and is, yeah, right, okay, yes.
16     Q     So in other words, that is a reference to
17 the alleged fraud that supposedly took place
18 regarding Mr. Tilley's income at the time of the
19 divorce proceeding in '94?
20     A     Right.
21     Q     Okay.  After you issued the subpoena,
22 which you served on Mr. Ecker, you then
23 subsequently did receive documentation from Pacer
24 through Mr. Ecker, correct?
25     A     Right.

```
 1      Q    So showing you what has been marked as
 2  Defendants' Exhibit 19.  Is that a copy of a letter
 3  from Mr. Ecker to you dated, approximately,
 4  August 18, 1999?
 5      A    Yes.
 6      Q    Do you recall getting this letter?
 7      A    Yes.
 8      Q    It came with a lot of documentation
 9  regarding David and Terri's income, right?
10      A    Correct.
11      Q    Came with the information?  In other
12  words, that is listed in the letter, right?
13      A    Right.
14      Q    Hang on just a second.
15              (Pause.)
16           MR. SMART:  Okay.  I don't have
17      anything further.
18
19              CROSS-EXAMINATION
20
21  BY MR. MUCHINSKY:
22      Q    Can you go back to Exhibit 29, please.
23      A    Okay.
24      Q    Wasn't this action that's described in the
25  verified complaint about the recovery of --
```

```
 1   shortfall of $48.54 on 81 child support alimony
 2   payments?
 3         A    It sounds right.  Where is that?
 4         Q    Paragraph 13.
 5         A    Well, I'd have to subtract 311.46 from
 6   360, but that sounds right.
 7         Q    Well, if you go down to 15.
 8         A    Right, 48.
 9         Q    The total amount claimed was $3,931.74?
10         A    Right.
11         Q    That's what this lawsuit was about?
12         A    Correct.
13         Q    When you -- at that time, Pacer was paying
14   Susan Tilley directly?
15         A    Right.
16         Q    They were shorting her the $48.54 each
17   week?
18         A    That was the alligation, yes.
19         Q    And is that what the settlement was about?
20         A    Right.
21         Q    When Susan got -- Susan Tilley got $5,000;
22   is that correct?
23         A    Correct.
24         Q    Did you tell her that you got her the,
25   approximately, $4,000 plus an extra thousand?
```

1      A     Correct.  Interest I believe is what I
2  said.
3      Q     When you -- did you type this additional
4  information on Exhibit 30, the release?
5      A     I don't recall.  I don't know if I typed
6  it or if I told them what I wanted typed in it.  I
7  don't remember.
8      Q     When you were -- if you could take a look
9  where it says, Mor particularly all claims.
10     A     Yes.
11     Q     The claims that you are talking about
12 there, are they the claims for the $3,900 and
13 3,931.74 that you mentioned in your verified
14 complaint?
15     A     Right.  Like I said before, the claims
16 that are specifically contained in this complaint.
17     Q     Right.  How did you -- when you were
18 talking about the diversion of income between --
19 what did you mean by that diversion of income?
20     A     Well, I'm a little vague on the details,
21 but as I recall, their -- Pacer's supposed reason
22 for not paying her the full amount was because he
23 wasn't making enough to -- something to do with
24 percentages of income and family court and how much
25 you're allowed to take out of a person's paycheck,

```
 1    and that that's why they were saying that because
 2    of the amount of his actual paycheck, they were
 3    only allowed to give her 311.46 instead of the full
 4    360, and the claim was that they were diverting
 5    income to Theresa in order to be able to do that.
 6         Q    Did you have any proof of that?
 7         A    At the time I recall that I did, but I
 8    don't remember now what that was, specifically.
 9         Q    What time was that?
10         A    At the time that we were talking about
11    filing the lawsuit.
12         Q    You don't recall what form it was?
13         A    No.  I don't recall specifically.  Like I
14    said before, I think that it was -- I remember
15    looking at how much David had earned in different
16    years in commissions and how much Susan -- excuse
17    me.  Theresa had earned in different years on
18    commissions and bonuses and things like that, and
19    it seemed suspicious the way his went down and hers
20    went up.
21         Q    Were those the payroll records that you
22    received from Mr. Ecker in August?
23         A    I don't remember.  I think I saw some
24    before that but -- I know that I saw something
25    before I filed this lawsuit, but I don't remember
```

```
 1   what it was.
 2        Q    If you could look at Exhibit 16.  It's the
 3   motion for modification.
 4        A    Okay.
 5        Q    When you were talking about paragraph 2B
 6   before, the income claimed by Defendant at the time
 7   of said orders was and is considerably less than
 8   his actual current income.  Now, isn't it a
 9   requirement to -- in order to get a modification
10   that you have to show that there's been a change in
11   circumstances?
12        A    Right.
13        Q    Is that what you meant in section B that
14   when the divorce was granted, income was one amount
15   and now years later it's a higher amount?
16        A    Well, that was part of it, but I do
17   believe that it was also -- I don't really
18   remember, specifically, but I do believe that
19   somewhere in there was something about that what he
20   said at the time wasn't what it really was.
21        Q    Somewhere where?
22        A    In the reasons for the modification.
23   Well...well, like I said, was and is, that -- it's
24   sort of a phrased broadly so that when we got to
25   court we could argue whatever we came up with for
```

1  proof of whether or not there was any difference in
2  what he said at the time and/or whether or not we
3  could show that it had increased or whatever.
4      Q    But you hadn't gotten the proof yet?
5      A    I don't remember.
6      Q    On Exhibit 29 again, the verified
7  complaint, you were talking briefly about the
8  verification page, which I think is five from the
9  back, and you said that Sue Tilley said that she
10 didn't sign that, and you said you had heard that
11 before?
12     A    No, I said that I knew about it, and I
13 knew about it because Attorney Smart had mailed me
14 the deposition, and I had read it.
15     Q    You noticed that the type on this page is
16 different than all the other type?
17     A    Yes.
18     Q    Any idea why that is?
19     A    Yeah.
20     Q    Why?
21     A    Because -- actually, it's strange that I
22 remember this. I typed this complaint at home on a
23 laptop word processor, because I was sick at the
24 time, and I typed the verification at my office on
25 their computer. And actually, well, I mean then

```
 1   you can say that then in 1999 that type was
 2   different too, different computer, from both of the
 3   other two, the motions in the family case.  Three
 4   different types of type.  Actually, four if you go
 5   to the deposition.
 6       Q    It looks like a typewriter was used to put
 7   in the dates, on an old fashioned typewriter?
 8       A    Right.
 9       Q    Is that what happened?
10       A    Probably.  I don't remember.  I know there
11   was one in the office.
12       Q    Was this verification attached to the
13   complaint when you say Susan signed it?
14       A    What do you mean by attached?
15       Q    Well --
16       A    Was it actually stapled at the time?
17       Q    Yes.
18       A    I don't remember.  I know that she had
19   seen the complaint and read it before she signed
20   it, but I don't remember if I actually stapled the
21   verification to the complaint before she signed it
22   or after.
23            MR. MUCHINSKY:  Okay.  Nothing
24       further.
25
```

```
 1                REDIRECT EXAMINATION
 2
 3   BY MR. SMART:
 4       Q    So just to briefly finish things out, at
 5   the time that you were representing Ms. Tilley, you
 6   were aware, were you not, that there was a
 7   requirement that any pleading that a lawyer submit
 8   to court be based on good grounds or good cause?
 9       A    Right.
10       Q    Right.  When you filed the verified
11   complaint and the action that that started on
12   behalf of Susan Tilley, and that's Exhibit 29, you
13   had good grounds for filing that action, right?
14       A    I thought so.
15       Q    The good grounds consisted of information
16   that you had gathered from your meetings with and
17   your communications with and documents that were
18   shown to you by Ms. Tilley, right?
19       A    Right.
20       Q    Among the information and the documents
21   which she shared with you was information that
22   provided good grounds for the idea or for the
23   supposition that income was being transferred
24   improperly by Pacer from David to Terri in order to
25   avoid certain child support obligations?
```

1     A     Right.
2     Q     Likewise, when you filed the motion for
3  modification and the motion for contempt in the
4  divorce proceeding, those are Exhibits 15 and I
5  believe 16, and this was in April of 1999, you had
6  good grounds also at that point for the alligation
7  that fraud had been committed at the time of the
8  divorce regarding Mr. Tilley's income at that time?
9     A     Right.
10    Q     Once again, the good grounds or the good
11 cause basis consisted of information that you had
12 obtained from Susan Tilley and your communications
13 with her?
14    A     Yes.
15    Q     At the time that you filed those motions
16 for contempt and for modification in April of 1999,
17 you were seeking as relief, among other things, any
18 other such actions as the court deems equitable and
19 appropriate under the circumstances, right?  That
20 language I just took, specifically, from the motion
21 for modification?
22    A     It's standard catchall language, yeah.
23    Q     There's also open ended language with
24 respect to the relief that you were seeking with
25 respect to the motion for sanctions, right, refer

```
 1   to the motion for contempt rather and that's
 2   exhibit?
 3       A   Say that again.
 4       Q   50.  Withdrawn.
 5           Let's leave the motion for contempt out of
 6   it and just focus on the motion for modification.
 7   That standard language asking for any other relief
 8   that the court deems appropriate was included in
 9   the motion for modification, right?
10       A   Right.
11       Q   Did you have the thought at the time that
12   you filed that motion that one thing that the court
13   might possibly do is to grant you some relief based
14   on the fact that a misrepresentation had been made
15   regarding Mr. Tilley's income at the time of the
16   divorce?
17       A   I'm not sure what you mean by that.  What
18   type of relief are you talking about?
19       Q   Did you think that the court might
20   possibly award some sort of arrearage award based
21   on the years when Mr. Tilley had supposedly
22   actually been making more money than had been
23   reported to the court?
24       A   Sure, but the money, the arrearage award
25   would have been against David.
```