UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN C. TILLEY, | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| v. | : | 3:02-cv-1312 (JCH) |
| | : | |
| ANIXTER INCORPORATED et. al., | : | NOVEMBER 1, 2005 |
| Defendants | : | |

**RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 67];
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 66]; and
MOTION FOR JOINDER [DKT. NO. 69]**

**I. INTRODUCTION[1]**

The plaintiff, Susan C. Tilley, filed the instant action against defendants Anixter

Incorporated, Pacer/Anixter, Inc., and David G. Tilley.  Compl. [Dkt. No. 1].  In response

to the plaintiff's claims, the corporate defendants counterclaimed for breach of contract.

Corporate Defs.' Amended Answer and Counterclaim [Dkt. No. 39].

This court granted defendants' motion to dismiss two of the plaintiff's claims but

denied their motion to dismiss the plaintiff's third claim.  Ruling [Dkt. No. 23].  This third

claim, a tort action for intentional infliction of emotional distress, also survived

defendants' subsequent Motion for Judgment on the Pleadings.  See Ruling [Dkt. No.

38].  The corporate defendants now move for summary judgment on this claim.

Corporate Defs.' Mot. Summ. J. [Dkt. No. 67].  Mr. Tilley moves to join their motion with

the exception of their argument that the release the plaintiff signed with the corporate

defendants bars her suit. Def. Tilley's Mot. Joinder [Dkt. No. 69].  Susan Tilley now

---

[1]In this ruling, the court will refer to Susan Tilley as the plaintiff and Anixter Inc., Pacer/Anixter, Inc.
and David Tilley as the defendants, even when discussing the counterclaim.  The phrase "corporate
defendants" refers to Anixter Inc. and Pacer/Anixter, Inc.

moves for summary judgment on the defendants' counterclaim.  Plf.'s Mot. Summ. J.
[Dkt. No. 66].

## II. STANDARD OF REVIEW

In a motion for summary judgment, the burden lies on the moving party to
establish that there are no genuine issues of material fact in dispute and that it is
entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c)); Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360
F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing –
that is pointing out to the district court – that there is an absence of evidence to support
the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d
Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord
Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show that there is
no genuine issue as to any material fact . . . ."  Miner v. City of Glens Falls, 999 F.2d
655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A dispute
regarding a material fact is genuine "'if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963
F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506
U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient
showing on an essential element of [its] case with respect to which [it] has the burden of
proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523 (internal citation omitted).  Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'" Id. (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate.").  "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment.  Id.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Western

3

World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that).  A self-serving affidavit that reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).

**III. FACTS**[2]

**A. Divorce Proceeding and June 1998 Action**

Susan and David Tilley were divorced in Connecticut Superior Court on October 18, 1994.  At the time of their divorce, Mr. Tilley worked for Pacer Electronics, Inc. ("Pacer").  Mr. Tilley's girlfriend (now wife), Terri Tilley, worked at the same company. During the divorce proceeding, Mr. Tilley and Michael Rosa, the president and CEO of Pacer, both testified about Mr. Tilley's compensation at Pacer.  In its final judgment of dissolution of the marriage, the Superior Court ordered Mr. Tilley to pay plaintiff $100 per week in alimony plus $260 per week in child support.  In December 1994, the Superior Court ordered Pacer to garnish Mr. Tilley's wages in the amount of $360 per week to pay the aforementioned support order.

In June 1998, shortly before the planned acquisition of Pacer by Anixter Inc. ("Anixter"), the plaintiff brought a state court action against Pacer, Anixter, Michael

---

[2]To the extent they are undisputed, this section sets forth the facts in the parties' local Rule 56(a)1 statements.  To the extent the facts are disputed, this section sets forth the facts in the light most favorable to the nonmoving party.  (If any disputed facts are relevant to both parties' motions for summary judgment, the court will set forth both parties' versions of the facts.)

4

Rosa, and Summit Partners, Inc., a corporation that controlled Pacer's assets.  Her complaint alleged that Pacer and Rosa had, for eighty-one consecutive weeks, sent her support checks of $311.46, rather than the $360 per week that the Superior Court had previously ordered.  Verified Complaint and Temporary Injunction paperwork, Susan Tilley v. Pacer Electronics, et. al., Conn. Sup. Ct., 6/8/98, Def. Ex. 29 [Dkt. No. 68-4].  Attorney Beth Rittenband[3] represented the plaintiff in the June 1998 action.  Attorney Rittenband testified at her deposition that the plaintiff's "belief that . . . Michael Rosa specifically was giving – putting David's commissions into Theresa's paychecks so that Sue wouldn't get the proper amount of child support taken out of the check" was "the basis for" the June 1998 complaint.  Rittenband/Deluco Dep. 26 [Dkt. No. 68-9].  Attorney Rittenband subsequently referred to this belief as "one of the issues" that the June 1998 complaint was about.  Id.  However, the June 1998 complaint does not state this allegation, but merely alleges a failure to pay the child support at the level ordered by the court.  The plaintiff disputes Attorney Rittenband's deposition testimony regarding diversion of income.  S. Tilley Aff. ¶11, attached to Plf.'s Mem. Law Opp. Defs.' Mot. Summ. J. [Dkt. No. 74] [hereinafter S.Tilley Aff. of 6/6/05].

The parties settled the June 1998 matter, and the plaintiff received $10,000.  In consideration for this sum, she signed a release, stating that she

> has remised, released and forever discharged, and by these Presents
> does remise release and forever discharge the said Releasees [Pacer,
> Rosa, Summit, and Anixter] of and from all debts, obligations, reckonings,
> promises, covenants, agreements, contracts, endorsements, bonds
> specialties, controversies, suits, actions, causes of actions, trespasses,

---

[3] Attorney Rittenband now goes by her married name of Deluco, but the court will refer to her as Beth Rittenband.

> variances, judgments, extents, executions, damages, claims or demands,
> in law or in equity, which against the said Releasees the Releasor ever
> had, now has or hereafter can, shall, or may have, for, upon or by reason
> of any matter, cause or thing whatsoever, from the beginning of the world
> to the date of these Presents.
>
> More particularly all claims or demands in law or equity arising or asserted
> in or in connection with an action pending in the Superior Court of the
> State of Connecticut for the Judicial District of Hartford/New Britain at
> Hartford, Docket No. CV-98-580678S.

Release, 6/17/98, Def. Ex. 30 [Dkt. No. 68-11]. The release stated that it did not apply

to claims the plaintiff may have had directly against Mr. Tilley. Id. In deposition

testimony, the plaintiff agreed that the Release provided for the release of Pacer and

Anixter from all claims that she had against them at the time she signed it. S. Tilley

Dep. Oct. 6, 2004 at 111, Def. Ex. 30 [Dkt. No. 68-6].

**B. April 1999 Motions**

In April 1999, Attorney Rittenband filed two motions in Connecticut Superior

Court on the plaintiff's behalf: a motion to hold Mr. Tilley in contempt of the court's

previous orders and a motion for modification of the court's orders in the divorce action.

Mot. for Contempt and Order to Show Cause, 4/19/99, Def. Ex. 15 [Dkt. No. 68-14; Mot.

for Modification of Orders and Order to Show Cause, 4/19/99, Def. Ex. 16 [Dkt. No. 68-

15]. The first of these two motions alleged in pertinent part that "[t]he defendant[ David

Tilley]'s actual income was and is considerably greater than that which he reported at

the time of said orders" and that, "[t]he defendant has committed fraud in the reporting

of his income." Mot. for Contempt and Order to Show Cause at ¶ 2-3. The second

alleged that "[t]he income claimed by defendant at the time of said orders was and is

considerably less than his actual current income, numerous details to which shall be

presented through evidence at the hearing on this Motion."  Mot. for Modification of Orders and Order to Show Cause at ¶ 2.b.  It requested the Superior Court to adjust child support payments, allow the plaintiff to claim her children as dependents for tax purposes, award sole custody to the plaintiff, and "take any other action as the Court deems equitable and appropriate under the circumstances."  Id. at prayer for relief.

The plaintiff asserts that she "did not have any proof of any diversion of income" until Pacer produced certain documents in response to an August 1999 subpoena.  S. Tilley Aff. of 6/6/05 ¶ 12 [Dkt. No. 74].  Attorney Rittenband requested that Pacer's attorney produce "all wage records of both David and Theresa Tilley, including regular pay, commissions, bonuses, car allowances, benefit plans," and other income over the preceding five years, which she stated were "essential" to the April 1999 motions. Letter from Rittenband to Ecker (6/11/99), Def. Ex. 50 [Dkt. No. 68-17]. In response, Pacer provided Attorney Rittenband with documentation regarding compensation paid to David and Terri Tilley from 1994 to August 1999.  Letter from Ecker to Rittenband (8/18/99), Def. Ex. 19 [Dkt. No. 68-20]; Rittenband/Deluco. Dep. 47-48 [Dkt. No. 68-9]; S. Tilley Aff. of 6/6/05 ¶ 12 [Dkt. No. 74].  The plaintiff states that she did not receive all of the wage documents Attorney Rittenband had requested until November 2004.  Id. at ¶¶ 12-13.

Soon after she had received the initial documents in April 1999, the plaintiff fired Attorney Rittenband.  Attorney Rittenband withdrew from the case in December 1999, and Attorney Robert Muchinsky (Ms. Tilley's current attorney) entered an appearance as Susan Tilley's counsel before the Connecticut Superior Court.  Mot. to Withdraw by Beth Rittenband, 12/6/99 [Dkt. No. 68-21]; Appearance of Robert B. Muchinsky,

7

12/23/99 [Dkt. No. 68-22].  Attorney Muchinsky filed two new motions on the plaintiff's

behalf, patterned after the April 1999 motions but alleging additional facts.  The Motion

for Contempt that he filed stated that Mr. Tilley's "actual income was and is

considerably greater than that which he reported at the time of said orders and

defendant has hidden over $300,000 in income since the time of said orders."   Mot. for

Contempt ¶ 2, 6/21/00 [Dkt. No. 68-23].  It also stated that Mr. Tilley "continued to

under report his income to Support Enforcement in North Carolina, Lincoln County who

were acting pursuant to a request from the State of Connecticut Support Enforcement

Division." Id. at ¶ 3.  Approximately nine days later, Attorney Muchinsky filed a Motion

for Modification of Orders, which repeated the above-quoted allegation from the April

1999 Motion for Modification and added that, since the time of the 1994 child support

orders, Mr. Tilley "has concealed over $300,000 in income."  Mot. for Modification of

Orders ¶ 2.B, 6/30/00 [Dkt. No. 68-24].  The plaintiff and Mr. Tilley resolved both June

2000 motions in a stipulated judgment on November 13, 2000.  Stipulation, Docket No.:

FA-92-0513362-S, Def. Ex. 25 [Dkt. No. 68-25].

### C. Plaintiff's Bankruptcy Proceeding

On June 8, 2000, shortly before Attorney Muchinsky filed the motions for

contempt and modification, the plaintiff filed for Chapter 7 bankruptcy in U.S.

Bankruptcy Court for the District of Connecticut.  S. Tilley Bankruptcy Pet., 6/8/00, Def.

Ex. 31 [Dkt. No. 68-26].  On the list of personal property on the bankruptcy petition

("Schedule B"), she included "Claim against ex-husband and ex-husband's employer for

back child support."  Id. at 965.  She did not include any other causes of action.  Id.

8

She included the same language on the list of property claimed as exempt ("Schedule C"), and cited to 11 U.S.C. § 522(d)(10)(D) as the law providing for this exemption.[4] The plaintiff did not amend her list of personal property at any time during the bankruptcy proceeding.  S. Tilley Dep. 10/6/04 at 125.  In July 2000, her bankruptcy trustee submitted a "no asset report." It stated that he had "neither received any property nor paid any money on account of [the plaintiff's] estate except exempt property," and that he found no property available for distribution to creditors.  Trustee's Report of No Distribution, 7/18/00 [Dkt. No. 68-28].  Plaintiff's bankruptcy case was closed on October 11, 2000.  Docket Report for Bankruptcy Petition No. 00-21630 [Dkt. No. 68-27].

## IV. DISCUSSION

As a preliminary matter, the court grants Mr. Tilley's Motion to Join in the Corporate Defendants' Motion for Summary Judgment on all grounds except the third[5] [Dkt. No. 69].

### A. Defendants' Motion for Summary Judgment

The defendants argue that the plaintiff lacks standing to pursue the present action because the tort claim for intentional infliction of emotional distress is the property of her bankruptcy estate.  A debtor or former debtor does not have standing to pursue claims that constitute property of a bankruptcy estate.  See, e.g., Seward v.

---

[4]11 USCS § 522(d)(10)(D) authorizes an exemption for "[t]he debtor's right to receive . . . alimony, support, or separate maintenance, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor."

[5]The corporate defendants argue as their third ground for summary judgment that the June 1998 release bars the plaintiff's present action.  Mr. Tilley was not a party to that release.  Release, 6/17/98 [Dkt. No. 68-11].

Devine, 888 F.2d 957 (2d Cir. 1989). With certain exceptions not relevant here, a bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (2005). Any cause of action that a debtor possesses at the time she files for bankruptcy is included in the bankruptcy estate. Seward, 888 F.2d at 963 (citing In re Cottrell, 876 F.2d 540, 542-43 (6th Cir.1989); Sierra Switchboard Co. v. Westinghouse Elec. Corp., 789 F.2d 705, 707-09 (9th Cir.1986) (holding that a claim for emotional distress was an asset of a bankruptcy estate)). A cause of action is an asset of the bankruptcy estate regardless of whether the plaintiff schedules it on the bankruptcy petition, Corell v. Equifax Check Services, Inc., 234 B.R. 8, 10 (D. Conn. 1997), as required by 11 U.S.C. § 521(1) and Fed.R.Bankr.P. 1007(b) and 9009. Causes of action that accrue after the filing of the bankruptcy petition are included in the bankruptcy estate if they accrue before termination of the bankruptcy proceeding. 11 U.S.C. § 541(a)(7) (listing "[a]ny interest in property that the estate acquires after the commencement of the case" among components of a bankruptcy estate); see also Corell, 234 B.R. at 10-11(internal citations omitted). The debtor may not pursue a cause of action accruing before or during the bankruptcy proceeding unless it has been properly abandoned by the estate. Seward, 888 F.2d at 963; Corell, 234 B.R. at 10; Tuttle v. Equifax Check Services, 1997 WL 835055, *2 (D.Conn. Jun. 17, 1997). Even the close of the bankruptcy case does not permit the debtor to assert a claim that has not been properly abandoned. Corell, 234 B.R. at 10; Tuttle, 1997 WL 835055, *2.

A trustee may abandon scheduled property, i.e., property that has been listed on

the bankruptcy petition, either through procedures requiring notice and a hearing, 11
U.S.C.  § 554(a) & (b), or by failing to administer it before the close of the bankruptcy
case, id. at § 554(c).  Unscheduled property, in contrast, can never be abandoned
without the notice and hearing required in sections 554(a) and (b).  See Corell, 234 B.R.
at 10; see also Hutchins v. IRS, 67 F.3d 40, 43 (3d Cir. 1995) ("It is clear that an asset
must be properly scheduled in order to pass to the debtor through abandonment under
11 U.S.C. § 554.").

       The plaintiff does not allege that her bankruptcy trustee gave notice to creditors
or held a hearing with regard to the instant claim.  Thus, she has standing in the
present action only if:  (1) it did not accrue before the close of her bankruptcy estate on
October 11, 2000, or (2) she scheduled the present claim on her bankruptcy petition
and the trustee did not administer it before the close of the estate.  The plaintiff
received payroll information from Pacer that revealed diversion of income from Mr.
Tilley to Terri Tilley in August 1999.  Compl. ¶ 15 [Dkt. No. 1].  Defendants correctly
argue that her claim for intentional infliction of emotional distress arising from this
income diversion accrued before that time.  See Calabrese v. McHugh, 170 F.Supp.2d
243, 257 (D.Conn. 2001) (internal citations omitted) ("In order to determine whether a
debtor had a property interest in a cause of action at the time he filed for bankruptcy,
we look to state law.  In Connecticut, a cause of action accrues when a plaintiff suffers
actionable harm.  The fact that this accrual date may be different than the date on
which the statute of limitations begins to run is irrelevant.").  Not only had the alleged
fraud occurred by the time of the bankruptcy petition, but Ms. Tilley had discovered in

11

August or September 1999 that Anixter had been diverting income from Mr. Tilley to Terri Tilley. S. Tilley Dep. 6/6/05 ¶ 12.

Indeed, in her Memorandum of Law in Opposition, the plaintiff does not argue that she did not know about the diversion of income during the pendency of her bankruptcy case, but rather argues that she properly scheduled the instant claim. With respect to that argument, it is undisputed that the bankruptcy trustee did not administer the instant claim before the close of the estate. The words plaintiff included on the personal property schedule on her bankruptcy petition are likewise undisputed. See supra, Part III.C. The parties dispute only whether these words rendered the instant emotional distress claim "scheduled" within the meaning of 11 U.S.C. § 521(1). Thus, no genuine issue of material fact exists on the matter of whether the bankruptcy proceedings deprived the plaintiff of standing in the present case. The court must determine if, in light of the undisputed terms of the bankruptcy petition, the plaintiff lacks standing as a matter of law.

A debtor filing for bankruptcy has a duty to list all of his or her assets, including legal claims, on the appropriate schedule of the bankruptcy petition. 11 U.S.C. § 521(1); Fed.R.Bankr.P. 1007(b) & 9009; 11 U.S.C. § 521(1); Pealo v. AAF McQuay, Inc., 140 F. Supp. 2d 233, 237 (N.D.N.Y. 2001). When "the debtor knows of the existence of [an] asset" and "expects to receive it," he or she should schedule it. Hutchins v. IRS, 67 F.3d 40, 43 (3d Cir. 1995). A "debtor has a duty to prepare schedules carefully, completely, and accurately." In re Mohring, 142 B.R. 389, 395 (Bankr. E.D.Cal. 1992), aff'd, 153 B.R. 601 (B.A.P. 9th Cir. 1993), aff'd, 24 F.3d 247 (9th Cir. 1994). However, few courts have addressed the level of specificity with which debtors must describe

assets in order to comply with 11 U.S.C. § 521(1).

> There are . . . no bright-line rules for how much itemization and specificity is required. What is required is reasonable particularization under the circumstances. The Official Forms themselves have generally been regarded as subject to a rule of substantial compliance. As one court has noted, "it would be silly to require a debtor to itemize every dish and fork," but "every bankrupt must do enough itemizing to enable the trustee to determine whether to investigate further."

In re Mohring, 142 B.R. at 395 (quoting Payne v. Wood, 775 F.2d 202, 205-07 (7th Cir. 1985) and citing Fed. R. Bankr. P. 9009 (Advisory Committee's note) for "substantial compliance" rule) (addressing an issue of whether property was listed as exempt but discussing property scheduling requirements in general); see In re Bonner, 2005 WL 2136204, *4 (6th Cir. BAP Sept. 6, 2005) (quoting Mohring and Payne). The Seventh Circuit has held that a major purpose of the scheduling requirement for exemptions "is to allow the trustee to decide which claims to challenge. Debtors are not perfectly trustworthy, and unless the claim of exemption contains sufficient detail to put the trustee on notice of questionable assertions, it will not be possible to administer the statutory scheme." Payne, 775 F.2d at 206; see also Mohring, 142 B.R. at 395 ("The rule in the Ninth Circuit is that trustee and creditors should be able to determine whether an exemption is valid by reading the schedules."). Similarly, in order for a bankruptcy trustee to accurately determine how much property an estate has available for distribution to creditors, the schedule of assets must put him or her on notice of all potential assets. "A complete schedule of assets and liabilities and a statement of the financial affairs of the debtor are indispensible tools needed for the effective administration of estates under all Chapters of the Code." Editor's Comment to Rule 1007(b), Norton Bankruptcy Rules 28 (2004-2005 ed.).

In <u>Bonner</u>, the Sixth Circuit Bankruptcy Appellate Panel applied the standard articulated in <u>Mohring</u> to hold that debtors' scheduling of an asset labeled "Auto Accident Claim" "plainly and unambiguously included any claim that the debtors may have had for any personal injury arising out of the automobile accident."  <u>Bonner</u>, 2005 WL 2136204 at *4.  It reasoned that, "it is common knowledge that an automobile accident may, and often does, result in personal injury. By listing 'Auto Accident Claim,' the debtors gave the Trustee sufficient information alerting him to the possible existence of a personal injury claim and the need for further investigation."  <u>Id</u>.  The <u>Bonner</u> court mentioned, as further support for its conclusion, that the debtors in that case had claimed an exemption on their bankruptcy petition for "personal bodily injury" resulting from their car accident.

The Ninth Circuit Court of Appeals addressed the issue of specificity in a somewhat different context in Cusano v. Klein, 264 F.3d 936 (9th Cir. 2001).  The Cusano court held that a debtor's listing of "songrights" of "unknown" value on a bankruptcy petition asset schedule encompassed claims for unpaid royalties that had not yet accrued at the time of petition.  <u>Id</u>. at 947; <u>see also</u> <u>Hutchins</u>, 67 F.3d (holding that debtor had no duty to schedule an asset that did not exist until after bankruptcy, but arose later from another asset that the debtor had scheduled).  In contrast, the <u>Cusano</u> court held that the listing of "songrights" was insufficient to encompass claims for unpaid royalties that had already accrued at the time of the petition, or claims for breach of fiduciary duty, fraud, and conversion that arose before the bankruptcy petition. It held that "[s]imply listing the underlying asset out of which the cause of action

14

arises is not sufficient" to formally schedule a cause of action.  <u>Id</u>. at 947 (citing

<u>Vreugdenhill v. Navistar Int'l Transp. Corp.</u>, 950 F.2d 524, 526 (9th Cir. 1982) (holding

that informal notice of a claim to a bankruptcy trustee is insufficient to satisfy the

scheduling requirement)). The unpaid royalties and other damages existing at the time

of petition were "subject to a separate scheduling requirement as accrued causes of

action." <u>Id</u>.

        In <u>In re Suplinskas</u>, 252 B.R. 293 (Bankr. D.Conn. 2000), the Bankruptcy Court

for this district reached a conclusion similar to that of the <u>Cusano</u> court.  The

Bankruptcy Court held that a "debtor's claims against third parties for damages based

on fraud in the purchase of a partnership interest is a separate asset from the debtor's

ownership of his partnership interest." <u>Id</u>. at 296.  The Bankruptcy Court based its

reasoning on two factors: first, the proceeds from settlement of the fraud claim did not

derive from liquidation of the partnership interest, and second, the debtors failed to

disclose at the time they filed their amended the schedule of exempt property on their

bankruptcy petition that they had received notice that they were a member of plaintiff

class in the fraud action.  <u>Id</u>. at 295-96.

        As discussed above, Susan Tilley listed on her personal property schedule a

claim "for back child support" against both Mr. Tilley and his employer, and she

included identical language to list the claim on her schedule of exempt property.  The

statute that she cited to support her assertion that this claim was exempt from

distribution to creditors was one authorizing an exemption for "[t]he debtor's right to

receive . . . alimony, support, or separate maintenance, to the extent reasonably

necessary for the support of the debtor and any dependent of the debtor."  11 USCS §

15

522(d)(10)(D).   It does not authorize any exemption for intentional infliction of emotional distress.   Moreover, at the time she filed for bankruptcy, the plaintiff had a pending claim for modification of a child support order, which is more appropriately styled a claim for back child support than the present claim would have been.   The language the plaintiff used to describe her claim, read in light of her assertion that the quoted section of the exemption statute applied to her claim, show that she scheduled a state court claim for unpaid child support, not for intentional infliction of emotional distress.   Like the Cusano plaintiff's pre-existing claim for unpaid royalties arising out of scheduled songrights and the Suplinskas debtor's pre-existing claim for fraud arising out of the purchase of a scheduled partnership interest, the fact that the instant plaintiff's claim for intentional infliction of emotional distress may have arisen out of the defendants' failure to pay adequate child support did not absolve her of a duty to schedule it separately from a claim for back child support.   Whereas "it is common knowledge" that an "Auto Accident Claim" is likely to result in a personal injury claim, Bonner, 2005 WL 2136204 at *4, a claim "for back child support" does not similarly inform a trustee of the need to investigate whether the plaintiff had a claim for intentional infliction of emotional distress arising out of fraud in connection with the reporting of Mr. Tilley's income.   The present emotional distress claim existed while the plaintiff was in bankruptcy, and the trustee lacked the information he needed to determine whether to pursue it.   Thus, it should have been scheduled separately on the plaintiff's bankruptcy petition.   Because it was not scheduled, it could not have been abandoned pursuant to 11 U.S.C. § 554(c), and it does not belong to the plaintiff.   If the plaintiff's allegations are truthful, the defendants' conduct in hiding Mr. Tilley's

16

income from the State, the plaintiff, and the children of the plaintiff and Mr. Tilley is extremely disturbing.  Nevertheless, the plaintiff does not have standing to pursue her claim for intentional infliction of emotional distress.

Having found that the defendant lacks standing as a result of the bankruptcy proceeding, the court need not address the remaining arguments the defendants have offered in support of their motion.  The court grants the defendants' motion for summary judgment.

### B.  Plaintiff's Motion for Summary Judgment

In support of her motion for summary judgment, the plaintiff argues that the corporate defendants' counterclaim does not allege a breach of contract as a matter of law.  The counterclaim alleges that the present action puts the plaintiff in breach of the release that she signed with the corporate defendants as part of the settlement of the June 1998 lawsuit  [hereinafter "Release"].

Because the court has diversity jurisdiction over the present case, it applies the substantive law of Connecticut, including choice of law rules.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Connecticut law governs the interpretation of the Release, because the Release was executed in this state, it did not specify a different choice of law, and the application of Connecticut law would not produce "arbitrary, irrational results."  See, e.g., Economou v. Borg-Warner Corp., 652 F. Supp. 1242, 1247 (D. Conn. 1987).  In Connecticut, releases from litigation are interpreted according to rules of contractual interpretation.  E.g., Muldoon v. Homestead Insulation Co., 746 A.2d 1277, 1245-46 (Conn. 2000).

17

Two disputed issues exist with respect to the interpretation of the Release:  (1) whether the words following the phrase "[m]ore particularly" should limit the broader release language that precedes them such that the Release would apply only to claims "arising or asserted in or in connection with" the June 1998 case, and (2) whether the Release bars claims arising after its signing.

The corporate defendants cite three cases to support the proposition that a release that includes general release language followed by the clause "more particularly" and a reference to a specific matter should be construed according to the more general language.  Murphy v. City of New York, 83 N.E. 39 (N.Y. 1907); Dunbar v. Dunbar, 5 Gray 103, 105 (Mass. 1855); Slayton v. Hemken, 36 N.Y.S. 249, 250-51 (N.Y. Gen. Term 1895).  Although these cases do state the foregoing proposition, they are a century old and do not even interpret Connecticut law.  Connecticut courts do not apply the rule the corporate defendants suggest.

> "It is well settled that a release, being a contract whereby a party abandons a claim to a person against whom that claim exists, is subject to rules governing the construction of contracts. . . . The intention of the parties, therefore, controls the scope and effect of the release, and this intent is discerned from the language used and the circumstances of the transaction. . . . It is similarly stated that a release, no matter how broad its terms, will not be construed to include claims not within the contemplation of the parties . . . and, where the language of the release is directed to claims then in existence, it will not be extended to cover claims that may arise in the future."

Muldoon v. Homestead Insulation Co., 650 A.2d 1240, 1246 (Conn. 1994) (quoting with approval Chubb v. Amax Coal Co., 466 N.E.2d 369 (Ill. 1984)).  Therefore, no matter what the 1998 release says, Susan Tilley would not have breached it by bringing claims that arose after it was signed.

18

The issue of whether the release covers claims that existed at the time of the release but which were not connected to the 1998 lawsuit is not appropriate for resolution at summary judgment.  Defendants correctly note that Connecticut courts "have frowned on interpreting a contract in a way that renders a clause in the contract mere surplusage and inoperative." Patron v. Konover, 35 Conn. App. 504, 518 (Conn. App. Ct. 1994).  "Every provision of the contract must be given effect if it can reasonably be done, because parties ordinarily do not insert meaningless provisions in their agreements."  Id. at 509.  However, the issue of contract interpretation is not always a question of law.  Connecticut case law "does not set forth a test by which to determine whether contract language is sufficiently definite to warrant its review as a question of law rather than as a question of fact."  Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P., 746 A.2d 1277 (Conn. 2000).  The Connecticut Supreme Court has recognized that "in the majority of the cases considering contract interpretation a matter of law, the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power." Id. In contrast, the Connecticut Superior Court, District of New London, held that interpretation of terms in a release that an injured automobile passenger signed with an insurance company depended on a disputed issue of fact, because the release was ambiguous and the parties disagreed about their intentions in reaching the agreement. Pudlo v. Allstate Ins. Co., 2000 Conn. Super LEXIS 2271 (Conn. Super. Aug. 22, 2000). Like the Tilley release, the Pudlo release contained broad language followed by a "more particularly" clause that referred to a particular action:

Greeting: Know Ye, That, I, Daryl T. Pudlo of Colchester, Connecticut, for

19

and in consideration of the sum of FIFTY THOUSAND ($ 50,000.00)
DOLLARS, lawful money of the United States of America to me in hand
paid by Christopher Moroch and Great American Insurance Company, the
receipt whereof is hereby acknowledged, have remised, released, and
forever discharged, and by these presents do for my heirs, executors and
administrators, remise, release and forever discharge the said Christopher
Moroch and Great American Insurance Company, their agents, servants
and employees, of and from all, and all manner of action and actions,
cause and causes of action, suits, debts, dues, sums of money, accounts,
reckoning, bonds, bills, specialties, covenants, contracts, controversies,
agreements, promises, variances, trespasses, damages, judgments,
extents, executions, claims and demands whatsoever, in law or in equity,
which against the said Christopher Moroch and Great American insurance
Company, I ever had, now have or which my heirs, executors or
administrators hereafter can, shall or may have for, upon and by reason of
any matter, cause or thing whatsoever from the beginning of the world to
the day of the date of these presents.

More particularly for personal injuries sustained by Daryl T. Pudlo on
August 20, 1995, on Route 16 in the town of Colchester, CT, which is the
subject of a civil action Docket No. CV970113459S which was brought in
the Judicial District of New London at Norwich.

Pudlo, 2000 Conn. Super. LEXIS 2271 at *9 n.3.  Mr. Pudlo, like Susan Tilley, argued

that the release was intended to be construed narrowly.  Id. at *10 ("The plaintiff

maintains that the release related only to the negligence action against Christopher

Murdoch and was not intended to affect any action against the defendant [insurance

company] for underinsured motorist benefits.").  The insurance company, like the Tilley

corporate defendants, argued for a broader interpretation.  Id.  ("The defendant argues

that the plaintiff has released the defendant from all liability arising out of the August 20,

1995 accident.").  The Pudlo court held,

Analysis of the contract focuses on the intention of the parties as derived
from the language employed. Where the intention of the parties is clearly
and unambiguously set forth, effect must be given to that intent. Contract
language is unambiguous when it has a definite and precise meaning . . .
concerning which there is no reasonable basis for a difference of opinion."
(Citations omitted; internal quotation marks omitted.)  Although ordinarily

20

> the question of contractual intent presents a question of fact for the
> ultimate fact finder, where the language is clear and unambiguous it
> becomes a question of law for the court.

Id. at *10-*11 (internal citations and quotation marks omitted).  Because the release

could "reasonably be interpreted" in either the manner suggested by the plaintiff or that

suggested by the defendant, the court concluded that its interpretation presented a

question of fact inappropriate for resolution at the summary judgment stage.  Id. at *11-

*12.  It noted that "[s]ummary judgment procedure is particularly inappropriate where

the inferences which the parties seek to have drawn deal with question of motive, intent

and subjective feelings and reactions." Id. (internal citation and quotation marks

omitted).

    The language of the release Susan Tilley signed is ambiguous under

Connecticut law because the release does not specify whether or not the "more

particularly" clause is intended to limit the general language that precedes it, and the

two clauses are inconsistent.  Contrast, for example, Tallmadge Bros., in which specific

language following more general language was preceded by the phrase "without limit."

Tallmadge Bros., 746 A.2d at 1282 n.9 & 10.   Moreover, Susan Tilley, unlike the

plaintiff in Tallmadge Bros., is not a corporation and does not necessarily possess

bargaining power equal to that of the corporate defendants.  Although Susan Tilley,

unlike Mr. Pudlo, did not specifically discuss the "intention" of the release in her

affidavit, she does not admit that her intention was to release claims she might have in

the future or claims not related to the 1998 suit.  Overall, the Tilley facts are very similar

to those in Pudlo.  In light of Pudlo and Connecticut's general approach to contract

interpretation, the interpretation of the "more particularly" clause depends on a question

21

of fact.

In addition, there is a genuine issue of material fact as to whether the plaintiff's present claim for intentional infliction of emotional distress was "arising or asserted in or in connection with" the June 1998 action for underpayment of child support.  As discussed above, Attorney Rittenband testified at her deposition that the plaintiff's "belief that . . . Michael Rosa specifically was giving – putting David [Tilley]'s commissions into Theresa [Tilley]'s paychecks so that Sue [Tilley] wouldn't get the proper amount of child support taken out of the check" was "the basis for" the June 1998 complaint.  This assertion is disputed by the plaintiff and is not obvious from the face of the June 1998 complaint.  But Attorney Rittenband's testimony creates genuine issues of material fact as to whether the plaintiff had notice of the alleged income diversion that gives rise to her present claim at the time of the Release, and as to whether this diversion of income arose or was asserted in connection with the June 1998 child support action.  Thus, even if the court were to interpret the release as barring only suits that arose on or before the release date and that arose or were asserted "in or in connection with" the June 1998 claim, summary judgment on the counterclaim would still be inappropriate.

## V. CONCLUSION

For the foregoing reasons, Mr. Tilley's motion to join the corporate defendants' motion for summary judgment, [Dkt. No. 69], and defendants' motion for summary judgment on the plaintiff's claim, [Dkt. No. 67], are GRANTED, and the plaintiff's motion for summary judgment on the corporate defendants' counterclaim, [Dkt. No. 66], is

DENIED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 1st day of November, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge